IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NEREYDA FRIAS,

CASE NO.: 6:09-cv-2023-Orl-31KRS

Plaintiff,

vs.

JERRY L. DEMINGS in his capacity as Sheriff
of Orange County, and GERALD CAVIS,  Orange
County Sheriff Deputy;

Defendants.

_____/

Defendants' Motion for Summary Judgment

Defendants, Jerry Demings, in his official capacity as Sheriff of Orange County, and Gerald

Cavis, Orange County Sheriff Deputy, file this motion for summary judgment pursuant to Federal

Rule of Civil Procedure 56, and seek summary judgment in their favor on all of the Plaintiff's

claims.

Grounds for motion

1.      The Defendants seek summary judgment on the Plaintiff's claim for "warrantless

entry" in Count I because the material undisputed facts reveal that Deputy Cavis had sufficient

authority to enter the plaintiff's apartment without a warrant.

2.      The Defendants seek summary judgment on the Plaintiff's Fourth Amendment false

arrest claim in Count II because Deputy Cavis had sufficient probable cause to arrest the plaintiff

3.      Defendant Sheriff Demings, in his official capacity, also seeks summary judgment

on the Plaintiff's civil rights claims in Counts I and II because the Plaintiff failed to prove the

existence of an unconstitutional custom or policy that was the moving force behind any alleged

constitutional deprivation.

1

4.      Defendant Cavis seeks summary judgment on the Plaintiff's Fourth Amendment claims in Counts I and II because he had sufficient arguable probable cause to arrest the Plaintiff, and because he did not violate clearly established law,  and he is therefore entitled to qualified immunity.

5.      Defendant Cavis seeks summary judgment on the Plaintiff's state law intentional infliction of emotional distress claim in Count III because the material undisputed facts reveal that he did not act with sufficient culpability to be liable.

Factual Summary

*Testimony of Nereyda Frias*

6.      Nereyda Frias was born on December 15, 1974, and is from the Dominican Republic, and she has lived in Florida for ten years, and she speaks limited English and used a Spanish interpreter during her deposition.  At the time of this incident, Nereyda Frias lived with her boyfriend, Alex Izurieta, and Alex's son, Cristian Izurieta, who was 13 years old.

7.      Nereyda Frias testified that on July 7, 2009, her boyfriend Alex Izurieta called the police because he came home to her apartment and Alex's older son, John Alex, was not at home and he, Alex, learned that the Plaintiff, Nereyda Frias, had taken his father (John Alex's grandfather) and John Alex to the airport.[1]  According to the Plaintiff, Alex and his father had an argument and Nereyda Frias got a call at work from John Alex asking if she would drive him and his grandfather to the airport.  She recalled that she got home after work at around 6:15 p.m. and saw luggage at the door and John Alex was dressed up ready to go and John Alex told her that he was leaving with his grandfather.  The Plaintiff testified that she asked Alex if his father knew that he was leaving and he said yes.  She took John Alex and his grandfather to the airport.

---

[1] Deposition of Nereyda Frias, p. 33.

8.      Later, at approximately midnight, she heard a knock on her door and it was Cristian, Alex's younger son, and he was asking where John Alex was, and she told him that he had left with his grandfather.[2]  Cristian then went and told his father and she came out of her room and spoke with Alex.  At that time she learned that Alex did not know that his father took his son to the airport.  It was at that time that Alex then called the police and the Plaintiff returned to her room.  When the Plaintiff heard Alex calling the police she asked him what he was doing and said that she could not believe that he was doing something like that and it really upset her that he was calling the police.  Nereyda Frias then went outside and went behind her apartment and sat there to smoke a cigarette and was feeling very sad.  Cristian went outside with her and sat with her and Cristian began to cry.[3]

9.      Nereyda Frias then saw a police officer and he said he had a question for her and she just stayed there with Cristian.  The police officer came towards her with Alex walking behind him and the police officer said I have to ask you a question.  At that point the Plaintiff started arguing with Alex and she admitted that she was saying some nasty things and she started to tell Alex that she could not believe you are a son of a bitch, how can you be doing this to your own father, don't you know they can arrest him for this.[4]  She testified that the police officer got upset because she was speaking in Spanish and she recalled that Cristian said to the police officer that she doesn't speak English.[5]  The officer said again, "I have to ask you a question" and the Plaintiff said Alex tell him it's your father, not to do anything, stop this.  She admitted that she

---

[2] Deposition of Nereyda Frias, p.36.

[3] Deposition of Nereyda Frias, p.37.

[4] Deposition of Nereyda Frias, p.38.

[5] Deposition of Nereyda Frias, p.39.

was very upset with Alex, and she admitted that she never said anything to the police officer and in her words "it's as if he wasn't there, I never directed any of my answers to him, only to Alex." She recalls that Alex was telling the police officer something, but she cannot say what was said because they were speaking in English.[6]  She did understand that the police officer was saying to her that he had a question and she responded by speaking to Alex in Spanish, but she did not respond to the police officer either in English or in Spanish.[7]

      10.     At that point the Plaintiff turned around and tried to go to the front door of her apartment and the police officer was standing there and so was Alex, "but it's not like I went right by him because there was a distance of about three feet between us."  She denied that the police officer was between her and the front door of her apartment and she claimed that she did not walk close to him, but rather Cristian was closest to the police officer and that the officer was standing on the grass and she walked past him on the sidewalk.[8]  She then walked into the apartment and Cristian came in behind her and the door closed because it closes by itself.  She testified "it's almost as if you slam the door, but it's not that anyone actually slammed it" and then the police officer walked in behind her and Cristian and it was her belief that the officer thought she slammed the door when instead the door closed by itself.[9]  She denied that she ever touched the police officer while she was walking towards the apartment or into the apartment. She admitted that the police officer told her to stop while she was walking towards her apartment, but she was practically already inside when he said that.  She admitted that she

---

[6] Deposition of Nereyda Frias, p.40.

[7] Deposition of Nereyda Frias, p.42.

[8] Deposition of Nereyda Frias, p.44.

[9] Deposition of Nereyda Frias, p.48.

understood what he was saying when she said stop, but she was already inside and she stopped inside the house. [10]  After she got inside she went to the kitchen with Cristian and the police officer came in and he came up to her and got close to her while she was grabbing a glass so that she could get some water out of the refrigerator.  At that point the officer said "what are you going to do hit me?" and Cristian said oh my God.  The Plaintiff responded "I'm only going to get some water".  She got a little bit of water from the refrigerator and then put it down by the sink and at that point the police officer grabbed her, twisted her arms and pushed her against the sink.[11]  As she was being bent over the sink she testified that she was wearing a towel and she took one of her arms to grab the towel because her towel was dropping.  The police officer then handcuffed her and took her outside and sat her on a chair and three other police officers arrived.  None of the police officers on the scene spoke Spanish and Cristian was translating for her.[12]

11.     She denied being physically injured in any way when she was arrested and she did not seek any medical attention as a result of her arrest, and she did not tell anyone at the jail that she was injured.[13]  She also denied being injured in any other way other than physical injuries.  She did not seek any medical treatment.[14]

*Testimony of Deputy Gerald Cavis*

12.     Deputy Cavis recalled getting dispatched to the scene in relation to a missing juvenile.  He was the first deputy to arrive on the scene, and he recalls meeting with the

---

[10] Deposition of Nereyda Frias, p.50.

[11] Deposition of Nereyda Frias, p.53.

[12] Deposition of Nereyda Frias, p.54.

[13] Deposition of Nereyda Frias, p.58.

[14] Deposition of Nereyda Frias, p.59.

complainant, a Hispanic male who he believes was the person who called the Sheriff's Office in reference to his son being gone without his permission.[15]  (This person was later identified as Alex Izurieta)  He recalled that Ms. Frias had taken his son to the airport and he recalled that Ms. Frias stated that he went to New Jersey with the grandfather.[16]  Deputy Cavis does not recall that the complainant, who we now know was Alex Izuritea, had a reason to be upset with the plaintiff.

13.    After Deputy Cavis spoke with Mr. Izuritea, he went and spoke with the Plaintiff, Ms. Frias, and he observed her to be standing near the apartment building, maybe 50 – 75 feet away from his patrol vehicle.[17]  He recalled approaching Ms. Frias on foot, wearing his full deputy uniform, and he introduced himself and told her he wanted to ask her some questions about the missing child.[18]  Immediately upon making contact with her, she started screaming in Spanish and looking behind Deputy Cavis in the direction where Mr. Izuritea was standing.  The plaintiff then charged forward towards Deputy Cavis and attempted to pass between him and the apartment building, even though there was a clear avenue of passing on the other side, and she purposely struck him with her shoulder on his side.  At that time, Deputy Cavis told her to stop and he said, "Police, Stop," and he said, in Spanish, "Alto, Policia," but she picked up speed and jogged towards the door and ran inside the house. [19]  Deputy Cavis then pursued her on foot and called it out on the radio, and the entire time he was yelling for her to stop.  The plaintiff

---

[15] Deposition of Gerald Cavis, p.11.

[16] Deposition of Gerald Cavis, p.12.

[17] Deposition of Gerald Cavis, p.20.

[18] Deposition of Gerald Cavis, p.23.

[19] Deposition of Gerald Cavis, p.24.

attempted to close the door between her and Deputy Cavis and Deputy Cavis stopped the door from closing, continuing after her into the house, and he secured her in the kitchen.[20]  He recalled that they were relatively close when they were initially standing next to each other outside the apartment building.  He also recalled she had an aggressive demeanor because she was speaking loudly and she was using hand gestures in an aggressive manner.[21]

14.    Deputy Cavis recalled that when he reached her in the kitchen of the apartment, she was reaching into the refrigerator, but he does not recall what, if anything, she pulled out of the refrigerator, because that was the time when he secured her.[22]  She was then placed in handcuffs inside the apartment and he walked her outside.  After her brought her outside the apartment he sat her down in a chair immediately outside the door.[23]  Deputy Cavis does not recall what happened regarding the investigation with respect to the minor who was Mr. Izuritea's son, and Deputy Cavis did not have any further action in reference to the missing juvenile call.[24]

*Testimony of Alex Izrieta*

15.    Alex that testified on the date of this incident came home to the Plaintiff's apartment where he was living and his younger son Cristian came out and said, hey dad grandfather's clothes are not here and John Alex was not there either and Alex then got upset and

---

[20] Deposition of Gerald Cavis, p.25.

[21] Deposition of Gerald Cavis, p.27.

[22] Deposition of Gerald Cavis, p.32.

[23] Deposition of Gerald Cavis, p.34.

[24] Deposition of Gerald Cavis, p.46.

started thinking that his father took his son.[25]  He then called the police and told them that his father had taken his son without permission.[26]  Alex was also upset with Nereyda because she had taken them to the airport.  Nereyda also got upset because he called the police.

16.     When the police came he told the police officer what happened and that his father had taken his son without permission.[27]  During this time Nereyda was very upset with Alex and was yelling and crying at the same time.  Alex recalled that Nereyda was upset and calling him names including "hijo de puta" which is Spanish for son of a bitch.[28]  He recalled that the police officer went to Nereyda and was trying to ask her a question because he was trying to figure out what was going on.  Alex testified that Nereyda then walked by the officer with Cristian and she went into the kitchen and the police officer told them "come back, stop, I need to talk to you" and when the apartment door closed that is when he thinks the officer got upset because he thought that they slammed the door on him, but instead the door closes by itself.[29]  The officer then went inside and pushed and kicked the door and the door just went "boom, you know, like the way he pushed it."[30]  He recalled that as Nereyda walked by the officer to go into her apartment the police officer told her to stop, but that was when she was already inside and the door had already closed.  He recalled the police officer telling Nereyda that he needed to ask her a question, but she did not respond to the officer, instead Nereyda was responding to Alex the entire time.

---

[25] Deposition of Alex Izurieta, p.11.

[26] Deposition of Alex Izurieta, p.12.

[27] Deposition of Alex Izurieta, p.13.

[28] Deposition of Alex Izurieta, p.15.

[29] Deposition of Alex Izurieta, p.16.

[30] Deposition of Alex Izurieta, p.17.

17.     The police officer then followed Nereyda into the apartment and when Alex got inside the apartment he saw Nereyda reaching inside the refrigerator and the policeman asked her what she was reaching for and he told her to back off, but she already had a glass of water at that point.  When Nereyda turned around with a glass of water she was really upset and she was really shaking and she started drinking and the policeman told her "are you going to hit me?"[31] The police officer then told Nereyda to put the glass on the counter and Cristian told her in Spanish to go ahead and do it and she did.  As soon as she did the police officer came from behind and grabbed her and pushed her against the counter and that's when Alex kind of got upset, so he walked towards the police officer and that's when the officer put his hand by his gun and told him to get back using the "f" word.  At that point Alex told the police officer he was making a mistake and the officer kept telling him to stay the fuck back.  The officer was by himself at that time and he was calling on the radio for help.[32]

Memorandum of Law

18.     The Plaintiff's pending claims in the Third Amended Complaint are: Count I, a Fourth Amendment claim for warrantless entry pursuant to 42 U.S.C. 1983 against both defendants; Count II, a Fourth Amendment claim for false arrest against both defendants, and Count III, a state law intentional infliction of emotional distress claim against Deputy Cavis only.

*Standard of Review*

19.     Summary judgment shall be granted if it appears that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[33]

---

[31] Deposition of Alex Izurieta, p.19.

[32] Deposition of Alex Izurieta, p.20.

[33] Federal Rule of Civil Procedure 56.

Although the burden of establishing that there is no genuine issue of material fact lies with the moving party, the non-moving party, so long as that party has had ample opportunity to conduct discovery, must come forward with affirmative evidence to support its claim.[34]  If, after the movant makes its showing, the nonmoving party brings forth evidence in support of its position on any issue for which it bears the burden of proof at trial that "is merely colorable, or is not significantly probative, summary judgment may be granted."[35]

*Deputy Cavis did not violate the Fourth Amendment*

20.     The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."[36]  "Physical entry into the home is the chief evil against which the wording of the Fourth Amendment is directed."[37]  However, the Supreme Court has recognized that circumstances sometimes preclude the obtaining of a warrant and therefore law enforcement officers are permitted to enter a residence without a warrant where probable cause and exigent circumstances exist.[38]

21.     The term 'exigent circumstances' refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.[39]  Federal

---

[34] Celotex v. Catrett, 477 U.S. 317, 326, 106 S. Ct. 2548, 2554 (1986).

[35] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986); Dombrowski v. Eastland, 387 U.S. 82, 87 S. Ct. 1425 (1967)(per curiam).

[36] U.S. Const. amend. IV.

[37] Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379 (1980).

[38] Warden v. Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642 (1967); United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991).

[39] United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983).

courts have recognized various situation in which exigent circumstances exist, and one of them is when police are in 'hot pursuit' of a suspect.[40]  This is because one cannot retreat into the home to thwart an otherwise proper arrest when the arresting officer is in hot pursuit and has probable cause to believe that the subject committed a crime and entered the house.[41]  Further, a hot pursuit "need not be an extended hue and cry in and about the public streets."[42]  A hot pursuit simply means "some sort of chase" and it can occur over a short distance.[43]

22.     In this case, the Nereyda Frias committed a violation of Florida statute 843.02 in the presence of Deputy Cavis when she refused to respond to Deputy Cavis while he was attempting to conduct an investigation.  Nereyda Frias testified that Deputy Cavis (the first deputy on the scene) said to her that he had a question to ask her, and she understood what she said, but she did not respond.  Instead, she ignored Deputy Cavis and responded to Alex.[44]  The following excerpts from the plaintiff's deposition are instructive:

Page 42, line 13…

Q.     Okay.  All right.  So he said to you – did he say to you in English, I have a question?

A.     Yes, in English.

Q.     And did you understand what he said?

A.     I did understand what he say.

---

[40] United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987); United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986).

[41] United States v. Santana, 427 U.S. 38, 43 96 S.Ct. 2406 (1976).

[42] United States v. Santana, 427 U.S. 38, 42 (1976).

[43] Santana, 427 U.S. at 42; United States v. Ramos, 933 F.2d 968 (11th Cir. 1991)

[44] Deposition of Nereyda Frias, page 42, line 13.

Q.      But did you not respond?

A.      I responded to Alex in Spanish.

Q.      But did you not respond to the police officer?

A.      I did not respond anything in English, only in Spanish.

Q.      Did you respond to the police officer in English or in Spanish?

A.      No.  I did not respond to the police officer.

_____

Page 47, line 16…

Q.      And you didn't respond directly to the officer either in English or in Spanish?

A.      No.

Q.      Well, that's a double negative.  Let me try that again.
        Did you respond to the officer's question either in Spanish or English?

A.      When the officer asked, I said to Alex:  I already explained everything to you.

Q.      Okay.  So you responded to Alex?

A.      Yes, not to the police officer.

Q.      You have to let us finish first.

A.      Pardon.

Q.      So when the police officer asked you that he wanted to ask you a question, you responded to Alex, correct?

A.      Yes, to Alex.

Q.      But you did not respond to the police officer, correct?

A.      Exactly.  But Alex responded to the police officers, but I cannot tell you exactly what it was because I was so upset I didn't understand.

_____

Page 50, line 5…

Q.      Did the police officer tell you to stop?

A.      He said it, but when I was practically already inside.

Q.      Did you stop?

A.      I was inside the house.

Q.      No, you said you were practically inside?

A.      Yes, but if you will note, I'm walking.  I'm coming in and he says stop, and that's when Cristian comes in.  The door closes and that's when he said or he thought that I slammed door.

23.      The plaintiff's actions constituted sufficient resistance and obstruction or opposition to Deputy Cavis while he was in the lawful execution of his duties that Deputy Cavis had sufficient probable cause to believe that she committed a violation of Florida statute 843.02, and a violation of that statute is punishable by imprisonment for up to one year.  Further, Deputy Cavis had sufficient authority pursuant to Florida statute 901.151 to conduct an investigative stop and ask questions of the plaintiff to determine what happened to Mr. Izurieta's son.  At that point in time, Deputy Cavis was conducting a lawful investigation, and the plaintiff's actions were obstructing his efforts. Further, when the plaintiff walked away from him, while continuing to ignore him, and ignoring his orders to stop, Deputy Cavis was permitted to follow her in order to place her under arrest, and it was not unreasonable for him to follow her into her apartment to effectuate the arrest.[45]  The plaintiff is not permitted to obstruct a law enforcement officer and then retreat to her home and use it as a shield from a lawful arrest.  Deputy Cavis was permitted to enter her apartment because of the hot pursuit exception to the warrant requirement, no matter how brief the hot pursuit may have been.

---

[45] Fla. Stat. 843.02.

*Deputy Cavis is entitled to qualified immunity*

24.     The Supreme Court has set forth a flexible two-step test for determining whether an official is entitled to qualified immunity.  Although the Supreme Court has held that lower courts have flexibility to consider each step in any order, the Plaintiff must nevertheless overcome each step.[46]  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation.  If no constitutional right would has been violated, there is no need to inquire further regarding qualified immunity."[47]  Therefore, if the facts of this case reveal that the Plaintiff did not suffer a constitutional violation, there is no need to proceed further with the qualified immunity analysis, and the officers are entitled to summary judgment in his favor.

*The Plaintiff failed to prove a Fourth Amendment violation*

25.     The plaintiff has failed to prove a violation of her right to be free from warrantless entry or unlawful arrest under the Fourth Amendment.  An arrest does not violate the Fourth Amendment if the arresting officer has probable cause to make the arrest, and the burden is on the Plaintiff to prove that the arresting officer lacked probable cause for the arrest.[48]  If an arresting officer has "probable cause to believe that an individual has committed even a very minor criminal offense in his presence, [then] he may, without violating the fourth amendment, arrest the

---

[46] Pearson v. Callahan, 129 S.Ct. 808 (2009).

[47] Wood v. Kesler, 323 F.3d 872, 877-878 (11th Cir. 2003)(quoting Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001)).

[48] Cuesta v. School Board of Miami-Dade County, Florida, 285 F.3d 962, 970 (11th Cir. 2002); Rankin v. Evans, 133 F.3d 1425, 1436 (11th Cir. 1998); Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996).

offender."[49]  Probable cause exists when an arrest is "objectively reasonable based on the totality of

the circumstances."[50]  An arrest is objectively reasonable when "the facts and circumstances within

the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a

prudent person to believe, under the circumstances shown, that the suspect has committed, is

committing, or is about to commit an offense."[51]  The "objectively reasonable" test applies without

regard to the arresting officer's underlying intent or motivation.[52]  In this case, the plaintiff cannot

meet her burden to prove that there was a lack of probable cause for his arrest in this case because it

is undisputed that there were four outstanding warrants or capias for his arrest.[53]  Likewise, for the

reasons expressed above, the Plaintiff cannot meet her burden to prove that Deputy Cavis violated

the Fourth Amendment when he entered the Plaintiff's apartment.

*Deputy Cavis did not violate clearly established law*

26.     Because the material undisputed facts reveal that the Plaintiff did not suffer a

deprivation of any constitutional right, there is no need to proceed further with the qualified

immunity analysis.[54]  However, even assuming a constitutional violation is found, the court must

then consider whether the asserted right was clearly established.  A right may be clearly

established for qualified immunity purposes in one of three ways: (1) case law that is materially

similar and pre-dates the allegedly unlawful conduct and truly compels the conclusion that the

---

[49] Storck v. City of Coral Springs, 354 So. F.3d 1307, 1314 (11th Cir. 2003).

[50] Durruthy v. Pastor, 351 F.3d 1080, 1088 (11th Cir. 2003).

[51] Id.

[52] Graham v. Connor, 490 U.S. 386, 396 (1989).

[53] Deposition of Devon Lorance, page 59.

[54] Wood v. Kesler, 323 F.3d 872, 877-878 (11th Cir. 2003).

plaintiff had a right under federal law,[55] (2) a broad statement of principle within the Constitution, statute or case law that clearly establishes a constitutional right and that provides fair warning of unlawful conduct.[56]   However, the general principle of law must be specific enough to give the officer notice of the clearly established right.  "Indeed, the principle that officers may not use excessive force to apprehend a suspect is too broad a concept to give officers notice of unacceptable conduct." or (3) the official's conduct lies so obviously at the very core of what the Constitution prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.[57]   This case is also not the occasionally encountered, exceptional case in which a police officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every objectively reasonable officer that what he was doing must be unreasonable within the meaning of the Fourth Amendment.

27.     Even assuming the Plaintiff proves that she suffered a deprivation of her constitutional right to be free from warrantless entry or unlawful arrest without probable cause, this Court must then decide whether the right was "clearly established" at the time of the alleged misconduct.[58]   In the context of an unlawful arrest claim under the Fourth Amendment, a law enforcement officer is entitled to qualified immunity even if this Court concludes that the arrest was

---

[55] Long v. Slaton, 508 F.3d 576, 584 (11th Cir. 2007); Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005).

[56] Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005); Hope v. Pelzer, 536 U.S. 730, 743 (2002).

[57] Mercado, 407 F.3d at 1160.

[58] Pearson v. Callahan, 129 S.Ct. 808, 815 (2009); Saucier v. Katz, 121 S.Ct. 2151 (2001).

undertaken without probable cause, so long as he had arguable probable cause for the arrest.[59]

Because only arguable probable cause is required, the inquiry is not whether probable cause actually

existed, but instead whether an officer reasonably could have believed that probable cause existed,

in light of the information the officer possessed."[60]  Arguable probable cause exists if "the facts and

circumstances within the officer's knowledge, of which he or she has reasonably trustworthy

information, would cause a prudent person to believe, under the circumstances shown, that the

suspect has committed, is committing, or is about to commit an offense."[61]  The arguable probable

cause standard protects even law enforcement officials who reasonably but mistakenly conclude that

probable cause is present.[62]

      28.    In the context of the warrantless entry claim, Deputy Cavis did not violate clearly

established law when he followed the plaintiff into her apartment.  Even if the Court were to

conclude that his actions violated the Fourth Amendment warrant requirement, the facts of this case

do not rise to the level of those facts which are so "clearly established" that Deputy Cavis knew

what he was doing violated the Fourth Amendment.  For that reason, Deputy Cavis is entitled to

qualified immunity on the warrantless entry claim.

*The Plaintiff has failed to prove the existence of an unconstitutional custom or policy within the*

---

[59] <u>Wood v. Kessler</u>, 323 F.3d 872, 878 (11th Cir. 2003); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1283 n.3

(11th Cir. 1999)("Arguable probable cause, not the higher standard of actual probable cause,

governs the qualified immunity inquiry."); <u>Montoute v. Carr</u>, 114 F.3d 181, 184 (11th Cir. 1997).

[60] Hunter v. Bryant, 502 U.S. 224, 228 (1991).

[61] Pickens v. Hollowell, 59 F.3d 1203, 1206 (11th Cir. 1995) (quoting Von Stein v. Brescher, 904

F.2d 572, 578 (11th Cir. 1990)).

[62] Hunter v. Bryant, 502 U.S. 224, 227 (1991); Malley v. Briggs, 475 U.S. 335, 343 (1986).

*Orange County Sheriff's Office*

29.     In order to impose liability upon Sheriff Demings, in his official capacity as Orange County Sheriff, the Plaintiff must first prove that she suffered a deprivation of his constitutional rights.[63]   In the event this Court concludes that the Plaintiff did suffer a deprivation of her constitutional rights, the Court would have to then consider whether the violation was the result of a custom or policy which was a moving force behind the alleged violation.[64]   Since a municipality will rarely have an express written or oral policy of inadequate training or supervision of its employees, the Supreme Court has explained that a plaintiff must prove that a city has a policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants.[65]   "Without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise."[66]   Generally, notice of the need to train is established by evidence that a city was aware of one or more prior similar incidents in which an individual's constitutional rights were violated.[67]

30.     Aside from the fact that the material undisputed facts reveal that the Defendants did not violate Plaintiff's constitutional rights, there is a distinct lack of evidence in the record in

---

[63] Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996).

[64] Monell v. Dept. of Social Services of City of New York, 436 U.S. 658 (1978); Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991).

[65] City of Canton v. Harris, 489 U.S. 378 (1989); Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir.), cert. denied, 525 U.S. 870 (1998).

[66] Gold, 151 F.3d at 1351.

[67] Kerr v. City of West Palm Beach, 875 F.2d 1546, 1556 (11th Cir. 1989).

this case to establish that the Sheriff had a custom or policy which either condoned or permitted officers to deprive citizens of their constitutional rights to be free from unlawful arrest or warrantless entries, or that the Sheriff was on notice of prior similar incidents in which an individual's constitutional rights were violated such that the City was "deliberately indifferent" to the obvious need for training in that area.  Generally, notice of the need to train is established by evidence that a city was aware of one or more prior similar incidents in which an individual's constitutional rights were violated.[68]  Summary judgment is appropriate where, as here, the Plaintiff did not produce evidence of a custom, policy or practice, on the part of the Defendant which lead to a violation of his civil rights.[69]

*Defendant Cavis is entitled to summary judgment on the intentional infliction of emotional distress claim*

31.      Although intentional infliction of emotional distress is a recognized tort under Florida law, its application is severely limited.  The Florida Supreme Court adopted the Second Restatement of Torts definition of intentional infliction of emotional distress which states: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."[70]  In other words, the threshold test to be followed in assessing behavior claimed to constitute intentional infliction of emotional distress is whether

---

[68] Id.

[69] Lenz v. Windburn, 51 F.3d 1540, 1545 n.3 (11th Cir. 1995); Williams v. City of Albany, 936 F.2d 1256, 1261 (11th Cir. 1991); Gold v. City of Miami, 151 F.3d 1346 (11th Cir. 1998).

[70] Eastern Airlines, Inc. v. King, 557 So. 2d 574 (Fla. 1990); Metropolitan Life Insurance Company v. McCarson. 467 So. 2d 277 (Fla. 1985).

such behavior is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."[71]   The test falls to the judiciary to decide, as a matter of law, whether the alleged conduct is objectively "atrocious and utterly intolerable in a civilized community," not whether the subjective response of the person who was the target of the conduct supports this tort.[72]

32.      The tort of intentional infliction of emotional distress can only be pled if the conduct is not violative of any other tort.[73]   Therefore, should the Plaintiff be permitted to proceed on any of his other tort claims, the claim for intentional infliction of emotional distress should be dismissed as a matter of law.

33.      In this case, the material undisputed facts reveal that Deputy Cavis' actions did not rise to the level sufficient for him to be liable for intentional infliction of emotional distress as a matter of law, and he is therefore entitled to summary judgment as a matter of law.

Conclusion

For all of the foregoing reasons, the Defendants respectfully request that this Court enter summary judgment in their favor on all of the Plaintiff's claims.

Certificate of Service

I certify that a copy of this document has been electronically filed with the Clerk of the Court this 2nd day of September, 2011, by using the CM/ECF system which will send a notice of electronic filing to: Charles E. Taylor, Jr., Esquire, Law Offices of Charles E. Taylor, Jr., Esquire, P.A., 18 West Pine Street, Orlando, Florida  32801.

---

[71] Ponton v. Scarfone, 488 So. 2d 1009 (Fla. 2d DCA 1985).

[72] Id. at 1011.

[73] Foshee v. Health Management Association, 675 So.2d 957 (Fla. 5th DCA 1996).

*s/ Ian D. Forsythe*
Ian D. Forsythe
Fla. Bar No. 054925
Hilyard, Bogan, & Palmer, P.A.
Post Office Box 4973
Orlando, Florida 32802-4973
Telephone (407) 425-4251
Facsimile  (407) 841-8431
Iforsythe@hilyardlawfirm.com
Attorneys for Defendant